# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| PAMELA GOODE, Administratrix of the | : | CIVIL ACTION |
| Estate of TIMOTHY GOODE, deceased, | : | |
| | : | |
| Plaintiff, | : | |
| | : | No. 10-894 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA and ANTHONY | : | |
| AVERY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                                        **FEBRUARY 12, 2018**

Presently before this Court is Defendants', the City of Philadelphia ("City") and Philadelphia Police Officer Anthony Avery ("P.O. Avery") (collectively, "Defendants"), Motion for Summary Judgment, which seeks dismissal of this action on all counts. Plaintiff Pamela Goode, in her capacity as the Administratrix of the Estate of her son, Timothy Goode ("Mr. Goode") has filed a Memorandum of Law in Opposition. For the reasons noted below, Defendants' Motion for Summary Judgment is granted.

Plaintiff's suit includes eight counts against Defendants.[1] In Count I, Plaintiff claims violations of Mr. Goode's constitutional rights pursuant to 42 U.S.C. § 1983 against the City and P.O. Avery. (Compl. ¶¶ 11–14.) In Counts II and III, Plaintiff claims Eighth and Fourteenth Amendment violations, respectively, against P.O. Avery. (*Id.* ¶¶ 15–18.) In Count IV, Plaintiff

---

[1] Plaintiff originally filed this action in state court. Defendants removed it to federal court based on federal question jurisdiction under 28 U.S.C. § 1331. The case was placed in civil suspense via Order dated August 24, 2010, due to an ongoing internal investigation by the Philadelphia Police Department ("PPD") that precluded fact discovery. (Doc. No. 6.) The case was removed from civil suspense and placed on the active docket by Order dated November 1, 2017. (Doc. No. 9.)

claims a violation of Article I, Section 26, of the Constitution of the Commonwealth of Pennsylvania against P.O. Avery. (*Id.* ¶¶ 19–21.) In Count V, Plaintiff claims violations of constitutional rights of freedom from excessive force, unlawful loss of liberty, and cruel and unusual punishment against P.O. Avery. (*Id.* ¶¶ 22–23.) In Counts VI, VII, and VIII, Plaintiff brings state law claims of a wrongful death action pursuant to the Pennsylvania Wrongful Death Act, 42 Pa. Const. Stat. § 8301, a survival action pursuant to the Pennsylvania Survival Act, 42 Pa. Const. Stat. § 8302, and negligence, respectively, against Defendants. (*Id.* ¶¶ 24–33.) Plaintiff has dismised all claims against the City, conceding that no liability against the City can be established, because "she does not have sufficient facts to pursue a claim under the [*Monell v. Dep't of Soc. Servs. Of the City of New York*, 436 U.S. 658 (1978)] line of cases." (Pl.'s Mem. Law in Opp'n. at 5.) Therefore, P.O. Avery is the only Defendant in this action and only the claims against him remain.

## I. BACKGROUND[2]

On January 11, 2008, P.O. Avery and his partner, Philadelphia Police Officer Oronde Watson ("P.O. Watson"), were in an unmarked police vehicle supporting a 39th Police District's tactical Narcotics Enforcement Team. (Defs.' Mem. Law in Supp. Mot. Summ. J. at 3.) Both officers were dressed in plain clothes. (*Id.*, Ex. 1, Deposition of PPD Officer Anthony Avery ("Avery Dep.") at 14.) P.O. Avery was displaying his badge around his neck and wearing a blue jacket with a vest that read "Police" and his badge number on the front. (*Id.*) P.O. Avery and P.O. Watson were called to assist in a "take down" of two men, identified as narcotics sellers, at the corner of Clapier Street and Wayne Avenue in the Germantown section of Philadelphia.

---

[2] In responding to Defendants' Motion for Summary Judgment, Plaintiff simply disputes a number of Defendant's factual allegations and does not provide her own version to this Court. Accordingly, we will take the following facts as undisputed, unless otherwise noted.

(Defs.' Mem. Law in Supp. Mot. Summ. J. at 3–4.)  As the narcotics team approached, one of the individuals, later identified as Mr. Goode, began to run down the street.  (*Id.* at 4.)

P.O. Avery exited the unmarked car and began to chase after Mr. Goode, yelling, "Police, stop; Police, stop."  (*Id.* (quoting Avery Dep. at 14).)  P.O. Watson was following on foot close behind.  (*Id.*)  While running down Wayne Avenue, P.O. Avery was able to grab Mr. Goode's hoodie and again yelled, "stop, police."  (*Id.* (quoting Avery Dep. at 15).)  Mr. Goode was able to pull away from P.O. Avery and began to cross the street in front of on-coming traffic.  (*Id.*)  Approaching the corner of Wayne Avenue and Logan Street, Mr. Goode threw a plastic bag under a nearby car and proceeded to run along the sidewalk of Logan Street.  (*Id.* at 5.)

As Mr. Goode turned the corner up Logan Street, P.O. Avery briefly lost sight of him.  (*Id.*)  According to P.O. Avery, his experience has led him to believe that a fleeing drug dealer may be armed.  (Avery Dep. at 18.)  Since Mr. Goode was suspected of drug dealing and P.O. Avery had lost sight of him turning the corner, P.O. Avery drew his service weapon.[3]  (*Id.* at 14.)  After P.O. Avery rounded the corner himself, he was able to close the gap enough between himself and Mr. Goode to grab Mr. Goode's shoulder.  (*Id.*)  However, Mr. Goode again was able to evade P.O. Avery's grasp.  (*Id.*)  It was then that P.O. Avery saw Mr. Goode produce a silver handgun.  (*Id.*)  According to P.O. Avery, Mr. Goode reached the handgun back towards P.O. Avery's groin and midsection "[as] if he was passing a baton in a race."[4]  (*Id.* at 20.)  This

---

[3] Plaintiff notes that the testimony given by P.O. Avery at his deposition differs slightly from the statement he made to the PPD during its internal investigation into this incident.  In his statement to the PPD, P.O. Avery said that, as he rounded the street corner, he placed his hand on his gun.  (Pl.'s Mem. of Law in Opp'n., Ex. B, Anthony Avery Investigation Interview Record ("Avery Interview") at 660.)  Plaintiff argues that this distinction prevents this Court from conducting a "reasonable person analysis."  (Pl.'s Mem. Law in Opp'n. at 1–2.)  We find that whether P.O. Avery drew his gun or placed his hand on it is not a genuine dispute of material fact necessary to defeat summary judgment.  Accordingly, we will conduct the reasonable person analysis assuming P.O. Avery drew his gun as he rounded the corner, per his deposition testimony.

[4] Plaintiff notes a discrepancy between P.O. Avery's deposition testimony, P.O. Avery's statement to the PPD, and P.O. Watson's statement to the PPD.  (*Id.* at 2–3.)  Each statement or testimony describes a slightly different

account was corroborated by P.O. Watson, who had also rounded the corner and witnessed Mr. Goode produce the handgun. (Pl.'s Mem. Law in Opp'n., Ex. C, Oronde Watson Investigation Interview Record ("Watson Interview") at 39.)

Seeing the handgun pointed at him, and fearing for the safety of both P.O. Watson and himself, P.O. Avery shot twice from the "on-guard" position, a police technique where the officer is trained to fire his service weapon from the hip area. (Defs.' Mem. Law in Supp. Mot. Summ. J. at 5.) Both bullets struck Mr. Goode in the back. (*Id.*) Mr. Goode, while still running, fell to the ground. (*Id.*) The handgun he pointed at P.O. Avery fell out of his hand and slid under a nearby car. (*Id.*; Watson Interview at 37–38.) Philadelphia Police Officer James Poulos ("P.O. Poulos") arrived at the scene immediately after the shooting and saw P.O. Watson pick up the handgun. (Pl.'s Mem. Law in Opp'n., Ex. D, James Poulos Investigation Interview Record ("Poulos Interview") at 2.)

Mr. Goode was transported to Temple University Hospital, where he was pronounced dead. (Defs.' Mem. Law in Supp. Mot. Summ. J., Ex. 3, Findings of the Firearms Discharge Review Board ("Investigation Report") at 588.)

## II. LEGAL STANDARD

### A. Rule 56(a) Standard

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as to a matter of law." *Anderson v. Libery Lobby, Inc.*, 477 U.S. 242–52 (1986).

---

description of Mr. Goode's body and/or head angle or direction. This Court finds that this dispute of fact is immaterial for purposes of defeating summary judgment because, as will be explained further below, nothing disputes the fact that both officers testified that Mr. Goode pointed a handgun at P.O. Avery.

4

The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362–63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411–12 (E.D. Pa. 1996). If the court determines that there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

### B.  Qualified Immunity Standard

The qualified immunity doctrine exempts a police officer, who is sued for a violation of an individual's constitutional rights, from trial and liability for the alleged wrong. *Carswell v. Borough of Homestead*, 381 F.3d 235, 241 (3d Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Tennessee v. Garner*, 471 U.S. 1 (1985)). In *Carswell*, the United States Court of

Appeals for the Third Circuit ("Third Circuit") detailed how courts should determine whether qualified immunity applies. *Id.* First, the court must consider two factors: (1) whether a constitutional violation has occurred; and (2) whether that constitutional right was "clearly established at the time of the alleged violation." *Id.* at 241–42 (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999)). If the court determines both of these factors were present, then it must look to whether the officer "made a reasonable mistake as to what the law requires." *Id.* at 242. "[I]f the officer's mistake . . . is reasonable, [then] the officer is entitled to the immunity defense." *Id.* (quoting *Saucier*, 533 U.S. at 205).

The *Carswell* court explained that qualified immunity is an objective, fact-intensive question to be decided by the court as a matter of law. *Id.* (citing *Bartholomew v. Pennsylvania*, 221 F.3d 425, 428 (3d Cir. 2000)). Thus, when determining whether the officer made a reasonable mistake, the court must consider the specific facts at hand. *Id.* "The question is whether, in the circumstances here, it would have been clear to a reasonable officer that [the] conduct was unlawful in the situation . . . confronted. If it would not have been clear, then qualified immunity is appropriate." *Id.* at 243.

### III. DISCUSSION

Mr. Goode was shot and killed by P.O. Avery during a foot pursuit on Logan Street in Germantown, Philadelphia. Plaintiff has brought this suit against P.O. Avery alleging several constitutional rights violations. (Compl. ¶¶ 11–18, 22–23.) Defendants assert in their Motion for Summary Judgment that P.O. Avery did not violate Mr. Goode's constitutional rights, or in the alternative, that Plaintiff cannot bring such claims because P.O. Avery is entitled to qualified immunity as a police officer employed by the City. (*See generally* Defs.' Mem. Law in Supp. Mot. Summ. J.) Prior to engaging in a substantive analysis of Plaintiff's allegations of

6

constitutional violations, it is necessary to address her primary contentions of disputed facts that supposedly preclude summary judgment.

### A. Disputes of Fact

In her response to Defendants' Motion for Summary Judgment, Plaintiff argues that this Court cannot grant summary judgment because there are genuine disputes of material facts. (*See* Pl.'s Mem. Law in Opp'n.) "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton*, 995 F. Supp. at 561 n.14 (quoting *Liberty Lobby*, 477 U.S. at 255). Plaintiff's arguments boil down to the following three factual disputes: (1) there are discrepancies between P.O. Avery's deposition testimony, P.O. Avery's statement to the PPD, and P.O. Watson's statement to the PPD regarding when P.O. Avery drew his service weapon and Mr. Goode's body position at the time he was shot; (2) the type of handgun Mr. Goode produced was incapable of being fired at P.O. Avery; and (3) Mr. Goode was unarmed at the time he was shot. For the following reasons, we find that these disputes of fact are either not genuine or not material.

#### 1. *Differences between Testimony and Police Statements by P.O. Avery and P.O. Watson*

Plaintiff contends that there are discrepancies in the record as to the timing of when P.O. Avery drew his service weapon during his pursuit of Mr. Goode and the way Mr. Goode was positioned at the time that he was shot.[5] In his deposition testimony, P.O. Avery stated that he drew his service weapon when he lost sight of Mr. Goode as Mr. Goode rounded a corner onto

---
[5] Plaintiff's counsel argues that the autopsy conducted following Mr. Goode's death is somehow incorrect. (Pl.'s Mem. Law in Opp'n. at 5.) Plaintiff's counsel concludes, without providing any basis or rationale, legal or otherwise, that the autopsy should be analyzed in a different manner. (*Id.*) Even upon considering the limited information and reasoning provided, we find this argument unconvincing.

Logan Street. (Avery Dep. at 17.) However, in his statement to PPD during an internal investigation into the incident, P.O. Avery stated that he had only placed his hand on his service weapon as Mr. Goode rounded the street corner. (Avery Interview at 660.) Additionally, P.O. Avery testified at his deposition that Mr. Goode turned his head and body to the right-side like an Olympic sprinter receiving a baton. (Avery Dep. at 20.) However, in P.O. Watson's statement to the PPD, he believed that Mr. Goode had turned to his left.[6] (Watson Interview at 38.) Plaintiff contends that these disputes relate to whether a jury would believe whether P.O. Avery or P.O. Watson were able to properly recall other facts and would need to be cross-examined.

We are sensitive to the issue that these types of cases are very fact-intensive and rely heavily on the facts presented during the discovery process. Further, the testimonies of the police officers involved are, unfortunately, often the only evidence available and cross-examination can be imperative. *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011). The Third Circuit held in *Lamont* that courts "must . . . look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably." *Id.* (quoting *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999)) (alterations in original) (citation omitted). Courts "should be cautious . . . to ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify." *Id.* at 181–82 (quoting *Abraham*, 183 F.3d at 294) (alterations in original) (citation omitted).

However, "the party opposing summary judgment . . . must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, 'and may not rely simply

---

[6] Plaintiff contends that there is also a difference between P.O. Avery's statement to the PPD and his deposition testimony as to the degree Mr. Goode turned his head or whether he turned his shoulders. (Pl.'s Mem. Law in Opp'n. at 2–3.) This Court is unable to discern any noticeable, non-semantic difference in P.O. Avery's statements.

on the assertion that a reasonable jury could discredit the opponent[s'] account.'" *Id.* at 182 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497 514 (3d Cir. 2003)) (alteration in original). Here, the discrepancies presented are not genuine or material to this case. In fact, all of the sources of evidence that are the basis of these discrepancies, P.O. Avery's deposition testimony, P.O. Avery's statement to the PPD, and P.O. Watson's statement to the PPD, corroborate the primary, material fact at issue in this case: that Mr. Goode pointed a handgun at P.O. Avery before P.O. Avery fired two shots. It is immaterial whether P.O. Avery drew his service weapon as he rounded the street corner or at a later point in the pursuit, because he was still able to fire two shots at Mr. Goode. Likewise, a dispute regarding the direction Mr. Goode had turned his body does not alter the fact that he produced and pointed a handgun at P.O. Avery. Therefore, there is no dispute of material fact and Plaintiff cannot defeat summary judgment here.

    2.    *Type of Handgun Produced by Mr. Goode*

Plaintiff contends that the handgun Mr. Goode produced had to be cocked before it would fire and that it was not cocked.[7] (Pl.'s Mem. Law in Opp'n. at 4, 7.) While this Court believes that this assertion is made as part of Plaintiff's argument against the reasonableness of P.O. Avery's actions, and, as such, will be discussed in that context below, this is also a dispute of fact that can be addressed here. First, it must be noted, however, that Plaintiff offers no evidence whatsoever to support this claim. Rather, Plaintiff's counsel introduces this notion in Plaintiff's Memorandum of Law in Opposition almost as an aside or off-handed conclusion, yet, surprisingly, also as a linchpin of the argument. (*Id.* at 4, 7 (stating "[t]he bottom line remains that the gun was not armed as it was the type of weapon that could only be fired after it has been

---

[7] In her Memorandum of Law in Opposition, Plaintiff uses the phrase "the gun was not primed" when referring to Mr. Goode's handgun. (Pl.'s Mem. Law in Opp'n. at 4, 7.) The term "primed" is not typically used to describe a handgun. However, considering the context in which the term is used, we believe Plaintiff means "the gun was not cocked" and we will analyze the related arguments as such.

primed" and "we already know the gun was not primed . . . .").)  However, Plaintiff's counsel does not bother to identify or describe the handgun or show that Mr. Goode had not cocked it to fire, if so required.

The record indicates that the handgun recovered at the scene was a Smith and Wesson, Model 5906, 9 MM caliber, semi-automatic pistol.  (Investigation Report at 586.)  A report drafted by the Firearms Discharge Review Board states "the firearm is operable with a trigger pull of seven (7) pounds single action and twelve and one-half (12 ½) pounds double action." (*Id.*)  A double action pistol does not need to be cocked before firing; at least not in the sense Plaintiff's counsel contends.  By pulling the trigger once on a double action pistol, the hammer is both drawn back and released into the chamber, firing the round.  *See* Todd S. Purdum, *Police, Citing Safety, Adopt New Gun*, N.Y. Times, June 2, 1987, http://www.nytimes.com/1987/06/02/nyregion/ police-citing-safety-adopt-new-gun.html.  Thus, Plaintiff's counsel is wrong that the handgun Mr. Goode produced could not be fired with a single trigger pull.  Consequently, this is not a genuine dispute of material fact that can defeat summary judgment

### 3. *Mr. Goode's Intent and Actions upon Drawing His Handgun*

Finally, the Plaintiff argues that there is a dispute as to whether Mr. Goode was aiming the handgun at P.O. Avery or whether he was attempting to throw the gun away or had thrown the gun away.  For the purposes of this section, this Court will focus on Plaintiff's claim that Mr. Goode was potentially an unarmed suspect because he had thrown the gun away prior to being shot by P.O. Avery.  We find that there is no dispute of fact and that Mr. Goode was armed at the time he was shot.

Plaintiff includes an expert report, written by Michael D. Lyman, Ph.D., as an exhibit to her Memorandum of Law in Opposition. (Doc. No. 12.) Plaintiff and Dr. Lyman rely on the statement that P.O. Poulos made to the PPD during the department's investigation to argue that Mr. Goode had thrown the handgun away. (Pl.'s Mem. Law in Opp'n. at 4, 8.) In his statement, P.O. Poulos said he heard, upon arriving at the scene, P.O. Avery shout "He threw a gun, He [sic] threw a gun." (*Id.* at 4 (quoting Poulos Interview at 2).)

However, both Plaintiff and Dr. Lyman fail to acknowledge that P.O. Poulos did not witness any events leading up to, and including, P.O. Avery shooting Mr. Goode. P.O. Poulos had just arrived at the corner of Wayne Avenue and Logan Street when he heard the two gunshots. (Poulos Interview at 2.) Immediately after, he rounded the corner, where P.O. Avery was attending to Mr. Goode and P.O. Watson running up behind. (*Id.*) It was then that he heard P.O. Avery say, "He threw a gun, He [sic] threw a gun." (*Id.*)

Dr. Lyman goes so far as to say, "[A]ccording to [P.O. Poulos'] statement, [Mr. Goode] discarded his firearm before he was shot." (Pl.'s Mem. Law in Opp'n., Ex. E, Expert Report of Michael Lyman, Ph.D. ("Expert Report") at 8 (citing Poulos Interview at 2).) This is a gross mischaracterization of P.O. Poulos' statement. P.O. Poulos' statement reads, in pertinent part:

> I started running south bound on Wayne Ave., as I closed half the distance to Logan Street I could see, what looked like Officer Watson turn the corner to go east bound on Logan Street on foot. I continued running, I neared the corner to go east bound myself when I could hear two gunshots. When I turned the corner, I could see Officer [sic] Avery and Watson. I could hear Officer Avery saying, "He threw a gun, He threw a gun."

(Poulos Interview at 2.) Notably, P.O. Poulos neither asserts that Mr. Goode was unarmed at the time that he was shot nor that he was present at the time of the shooting.

Plaintiff offers no evidence to contradict the corroborating testimony and statements of P.O. Avery and P.O. Watson that Mr. Goode was, in fact, armed and pointing a handgun at P.O.

Avery. Additionally, both P.O. Avery and P.O. Watson stated that, after being shot, Mr. Goode fell to the ground and the handgun slid out of his hand and next to or under a nearby car. At his deposition, P.O. Avery testified that "[the handgun] fell out of [Mr. Goode's] hand. It hit the ground and bounced . . . between the sidewalk and the rear tire of the Escalade . . . ." (Avery Dep. at 17–18, 30–31.) P.O. Watson testified at his deposition that "[t]he gun that was in [Mr. Goode's] hand slid into the street under one of the . . . parked cars." (Defs.' Mem. Law in Supp. Mot. Summ. J., Ex. 2, Deposition of PPD Officer Oronde Watson ("Watson Dep.") at 13.) There is no evidence in the record that would indicate that Mr. Goode had thrown the handgun away before he was shot.

As a result, Plaintiff has failed to articulate any facts that would create a genuine issue of material fact regarding whether Mr. Goode was unarmed at the time that he was shot. Accordingly, we cannot find that Plaintiff has demonstrated the existence of a genuine issue of material fact on this claim sufficient to surpass summary judgment.

### B. Constitutional Rights Violations against P.O. Avery

As noted above, Defendants argue that P.O. Avery did not violate Mr. Goode's constitutional rights or, if he did, that he is entitled to qualified immunity. (*See generally* Defs.' Mem. Law in Supp. Mot. Summ. J.) In her Complaint, Plaintiff alleges violations of three constitutional amendments against P.O. Avery: (1) Eighth Amendment violations of an individual's right of protection from cruel and unusual punishment; (2) Fourteenth Amendment violations of an individual's right to due process and equal protection of the laws; and (3) Fourth Amendment violations of an individual's right against unlawful searches and seizures. (*See* Compl. ¶¶ 11–33.)

1. *Cruel and Unusual Punishment*

In their Motion for Summary Judgment, Defendants argue that the Eighth Amendment claim must be dismissed because the Eighth Amendment only applies following a conviction. (Defs.' Mem. Law in Supp. Mot. Summ. J. at 12 (citing *Ingraham v. Wright*, 430 U.S. 651, 664 (1977)).) In *Ingraham*, the United States Supreme Court ("Supreme Court") declined to extend Eighth Amendment protections to public school children being subjected to physical discipline. *Ingraham*, 430 U.S. at 669–70. The *Ingraham* Court held that the Eighth Amendment was intended to act as a safeguard against the "unnecessary and wanton infliction of pain" following the incarceration of a prisoner. *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). In other words:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . [,] it transgresses the substantive limits on state action set by the Eighth Amendment and Due Process Clause.

*Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). The Third Circuit has held that there must be a state-imposed restraint on personal liberty. *See id.* at 457.

In the instant matter, the Plaintiff does not offer any evidence showing a criminal conviction, incarceration, or state-imposed restraint of Mr. Goode at the time that he was shot. Therefore, this Court finds no Eighth Amendment violation occurred and summary judgment is granted as to Count II of Plaintiff's Complaint.

2. *Use of Excessive Force*

The law surrounding the constitutionality of police killings of this nature is well established. In *Garner*, the Supreme Court held that:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, **if the suspect threatens the officer with a weapon** or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, **deadly force may be used if necessary** to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11–12 (emphasis added). In *Graham v. Connor*, the Supreme Court further explained that the use of deadly force to effect a "'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." 490 U.S. 386, 395 (1989). The *Graham* Court explained that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

The Third Circuit has provided district courts with a clear standard: "Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others?" *Abraham*, 183 F.3d at 289. The Third Circuit emphasized the importance of considering all of the evidence leading up to the shooting. *Id.* at 291. However, not all facts must be weighted equally. *Id.* at 292 (holding attenuation of facts leading up to seizure should be taken into account when analyzing totality of circumstances).

In this case, there is no dispute that Mr. Goode produced a handgun and aimed it at P.O. Avery. (*See* Avery Dep. at 17–18; *see also* Watson Dep. at 13.) This fact outweighs almost every other fact because it immediately created a situation where a reasonable officer would believe that Mr. Goode "posed a significant threat of death or serious physical injury to the officer or others." *See Abraham*, 183 F.3d at 289. While this Court notes that Mr. Goode was

suspected of a non-violent crime and that P.O. Avery was almost able to apprehend Mr. Goode on not one, but two occasions, Mr. Goode nevertheless produced a handgun and aimed it at P.O. Avery. *Garner* explicitly states that, "if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary." *Garner*, 471 U.S. at 11–12.

As discussed above, Plaintiff argues that the handgun Mr. Goode produced was a type that could not be fired without first being cocked and, therefore, posed no threat to P.O. Avery. (Pl.'s Mem. Law in Opp'n. at 4, 8.) We have already found that this assertion has no basis. *See* discussion *supra* Section III.A.2. Further, we note that Plaintiff's argument also fails on the merits for several reasons. First, the shape of a 9 MM Smith and Wesson is so ubiquitous and common that any reasonable officer at the scene would recognize it as a handgun and understand the threat it posed. Any distinction between the single action and double action version of the model is so minute (typically, a slightly different shape and feel to the trigger) that it would be impossible to discern without a much closer inspection than the situation afforded. Second, whether a handgun needs to be cocked or not is immaterial. Typically, the officer has no way of knowing whether a handgun is capable of being fired until after it is fired. By design, handguns are extremely easy to use and incredibly dangerous. Additionally, most common handgun types can be cocked using the thumb and without adjusting hand position. Without making any conclusions outside the facts of this case, asking P.O. Avery to wait and make a determination that is not readily apparent regarding a handgun pointed at him is not "objectively reasonable." *See Abraham*, 183 F.3d at 289; *see also Lamont*, 637 F.3d at 184 ("Waiting in such circumstances could well prove fatal.") (citing *Thompson v. Hubbard*, 257 F.3d 896, 899–900 (8th Cir. 2001); *Kruger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993); *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991)).

Regarding Plaintiff's argument that Mr. Goode was merely attempting to throw the handgun away, Plaintiff does not present sufficient evidence to create a genuine issue of fact. All relevant evidence makes it clear that Mr. Goode pointed the handgun backwards towards P.O. Avery. (*See* Avery Dep. at 17–18; Watson Interview at 37–38.) The law is clear that the situation must be analyzed as to what a reasonable officer at the scene would believe, not by the intention of the individual posing the threat. *See Abraham*, 183 F.3d at 289. Nothing in the record indicates any way for P.O. Avery to understand Mr. Goode's decision to produce a handgun. As Plaintiff admits, P.O. Avery never yelled for Mr. Goode to drop his handgun; therefore, any reasonable officer at the scene could believe that Mr. Goode was producing and aiming the handgun on his own volition and for a dangerous purpose. (*See* Pl.'s Mem. Law in Opp'n. at 7.)

In sum, all of the record evidence shows that Mr. Goode produced a handgun and aimed it at P.O. Avery. The Supreme Court has said this type of situation is the most common justification for the use of deadly force. *See Brosseau v. Haugen*, 543 U.S. 194, 204 (2004) (discussing how threatening anyone with a weapon is the main justification for use of deadly force by police officer). Mr. Goode's possession of a handgun and pointing it towards P.O. Avery posed an immediate and significant threat of bodily harm to P.O. Avery, as well as to P.O. Watson. *See Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007) (finding officer was reasonable to conclude suspect holding rifle posed serious threat, even though rifle was not aimed at anyone). It was objectively reasonable for P.O. Avery to believe that use of deadly force was necessary in order to prevent Mr. Goode from causing bodily injury to P.O. Avery or P.O. Watson. Therefore, Plaintiff cannot claim Fourth Amendment protections against the use of

excessive force. Accordingly, summary judgment is granted in favor of Defendant on Counts III and V.[8]

Since we find that no constitutional violation occurred, we need not determine if P.O. Avery is entitled to qualified immunity. *See Carswell*, 381 F.3d at 241 (holding qualified immunity is used to exempt police officers from liability for alleged violations of constitutional rights).

**C.     State Law Claims**

Plaintiff's remaining claims are under state law concerning a violation of civil rights under the Constitution of the Commonwealth of Pennsylvania, a wrongful death action pursuant to the Pennsylvania Wrongful Death Act, a survival action pursuant to the Pennsylvania Survival Act, and negligence against P.O. Avery. (Compl. ¶¶ 24–33.) Supplemental jurisdiction allows this Court to review these claims, so long as they form a part of the same case or controversy as the federal claims. *See* 28 U.S.C. § 1367. A court that has dismissed all federal claims relating to an action should decline to exercise supplemental jurisdiction over any remaining state claims and can choose to dismiss those claims. *See Black v. City of Reading*, No. 04-CV-05007, 2006 WL 964118, at *9 (E.D. Pa. April 10, 2006) (citing *Fortuna's Cab Serv. v. City of Camden*, 269 F. Supp. 2d 562, 566 (D.N.J. 2003)). Since we have dismissed all of the federal claims in this case, we decline to exercise supplemental jurisdiction over the state claims against P.O. Avery and choose to dismiss Counts IV, VI, VII, and VIII of Plaintiff's Complaint without prejudice.

---

[8] Plaintiff claims violations of both the Fourth and Fourteenth Amendments. (Compl. ¶¶ 17–18, 22–23.) However, because this incident arose from an arrest of a free citizen, it "should be analyzed solely under the Fourth Amendment and not under the Fourteenth Amendment." *See Campbell v. City of Philadelphia*, 927 F. Supp. 2d 148, 153 n.2 (E.D. Pa. 2013) (citing *Graham*, 490 U.S. at 394–95). Therefore, Counts III and Counts V are properly analyzed under the Fourth Amendment standard. *See Graham*, 490 U.S. at 394–95.

**IV.	CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted.

An appropriate Order follows.